1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10    PHILLIP V. LIGGINS,

11              Petitioner,                    No. 2:09-cv-1777 GEB EFB P

12        vs.

13    MIKE MCDONALD,

14              Respondent.               FINDINGS AND RECOMMENDATIONS

15    _____/

16        Petitioner is a state prisoner proceeding without counsel with an application for a writ of

17    habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a June 22, 2006 judgment of

18    conviction entered against him in Sacramento Superior Court on charges of possession of a

19    controlled substance, transportation of a controlled substance, and driving on a suspended

20    license.  He received a sentence of 25 years-to-life in state prison pursuant to California's Three

21    Strikes Law.  Petitioner seeks relief on the grounds that: (1) his trial counsel rendered ineffective

22    assistance; (2) he was subject to an unreasonable search and seizure; (3) his appellate counsel

23    rendered ineffective assistance; and (4) his constitutional rights were violated by the prosecutor's

24    improper use of peremptory challenges to exclude two African Americans from the jury (*Batson*

25    claim).

26    ////

1

Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's application for habeas corpus relief be granted, in part, on petitioner's *Batson* claim and denied in all other respects.

## I.    Procedural and Factual Background

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal[1], the California Court of Appeal for the Third Appellate District provided the following factual summary:

> In May 2005, Sacramento County Deputy Sheriff Duncan Brown was on patrol and followed a white Lincoln to a gas station. Defendant exited the Lincoln and entered the gas station. Deputy Brown checked the car's license plate number and was informed defendant had recently purchased the car. The Department of Motor Vehicles' record showed defendant's driver's license was suspended except for in the course of employment. After defendant left the gas station in the Lincoln, Deputy Brown pulled him over. Defendant exited his car, approached Deputy Brown, identified himself, and stated he was on his way home.
>
> Deputy Brown searched defendant, finding a "wad" of cash and "a plastic baggy that had some white powder in it." He then placed defendant in handcuffs, ordering him to stand next to the patrol car. Defendant took the baggy and smashed it between his fingers. Upon a subsequent search, Deputy Brown found another baggy in defendant's pocket containing two rocks, which later were determined to contain cocaine.

## II.    Analysis

### A.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir.

---

[1] Notice of Lodging Documents on December 21, 2009 (Dckt. No. 14 ), Resp.'s Lodg. Doc. 4 (hereinafter Opinion).

1  2000).

2          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

3  corpus relief:

4                  An application for a writ of habeas corpus on behalf of a
               person in custody pursuant to the judgment of a State court shall
5              not be granted with respect to any claim that was adjudicated on
               the merits in State court proceedings unless the adjudication of the
6              claim -

7                  (1) resulted in a decision that was contrary to, or involved
               an unreasonable application of, clearly established Federal law, as
8              determined by the Supreme Court of the United States; or

9                  (2) resulted in a decision that was based on an unreasonable
               determination of the facts in light of the evidence presented in the
10             State court proceeding.

11         For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

12  holdings of the United States Supreme Court at the time of the state court decision. *Stanley v.*

13  *Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06

14  (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is

15  clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d

16  at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).

17         A state court decision is "contrary to" clearly established federal law if it applies a rule

18  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

19  precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003).

20  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

21  the writ if the state court identifies the correct governing legal principle from the Supreme

22  Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2]

23  *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

24

25         [2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be
   overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
   presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,
26  384 F.3d 628, 638 (9th Cir. 2004)).

3

F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be

presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85.  This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  *Harrington*, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

**B.  Petitioner's Claims**

### 1. <u>Ineffective Assistance of Counsel</u>

Petitioner's first claim is that his trial counsel rendered ineffective assistance when he advised petitioner not to accept a plea offer of ten years in prison because he was confident he would prevail on a motion to suppress.  Petitioner argues that this advice was improper because counsel was aware of petitioner's numerous prior convictions and possible Three Strikes sentence if the motion to suppress was denied and petitioner was convicted after a trial.

////

////

////

5

Pet. at 4.[3]  Petitioner states that he trusted his trial counsel's assurance that he "was going to win the motion to suppress, and that when that happened, petitioner was going to be free."  Traverse at 9.  He explains that counsel "encouraged [him] not to take the ten years offer."  *Id.*  He states that he told his trial counsel he was "afraid of losing the motion to suppress," but that counsel responded, "do not worry man, we will win the motion to suppress, and after that, you go home."  *Id.*  Petitioner states he would have accepted the plea offer if his counsel had told him to accept it.  *Id.*  at 10.  He requests that the offer for a ten year prison term be reinstated and that he receive an evidentiary hearing on this claim.  *Id.*  at 13.

The state court record reflects that at petitioner's sentencing hearing, his trial counsel discussed the plea offer and petitioner's rejection of that offer, as follows:

> prior to the motion to suppress, [petitioner] had an offer from the D.A. of ten years but that was contingent with Mr. Liggins got not [sic] going forward with the motion to suppress, which the Court knows is statutorily, and I believe constitutionally, a right of Mr. Liggins to go forward with.
>
> I mean, his choice at that point was ten years which would make him 60 years old roughly by the time he got out of prison when he's spent most of his life in prison actually.
>
> It was my opinion, and without going into what my recommendation was to Mr. Liggins, and Mr. Liggins had the final word, that he and including myself believed that there was at least a reasonable chance that that motion to suppress would succeed.
>
> Mr. Liggins knew going into it that realistically anything could happen, and there were certainly no guarantees and no percentages given whether he had a better chance he if [sic] would succeed or not.  But he was at least quite aware that at least there was a very good chance that the motion would not succeed.
>
> He made that choice, and as a result of that, the ten-year offer from the district attorney's office went away.

Reporter's Transcript on Appeal (RT) at 320-21.  In the answer, respondent argues that these

---

[3]  This court will refer to page numbers of the parties' pleadings by using the automated numbers assigned by the court's electronic filing system.

1    statements by counsel reflect that petitioner was advised of the risks of rejecting the plea offer

2    but that he simply chose to proceed with the motion to suppress and assume the risks.  Answer at

3    17.  He argues that petitioner's trial counsel did not render ineffective assistance in failing to

4    convince petitioner to accept the offer.  *Id.*

5         Petitioner raised this claim in habeas corpus petitions filed in the California Court of

6    Appeal and California Supreme Court.  Resp.'s Lodg. Docs. 6, 8.  Those petitions were

7    summarily denied.  Resp.'s Lodg. Docs. 7, 9.  Accordingly, this court will independently review

8    the record to determine whether habeas corpus relief is available under section 2254(d).

9    *Delgado*, 223 F.3d at 982.

10                          a. __Legal Standards__

11        To support a claim of ineffective assistance of counsel, a petitioner must first show that,

12   considering all the circumstances, counsel's performance fell below an objective standard of

13   reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  After a petitioner

14   identifies the acts or omissions that are alleged not to have been the result of reasonable

15   professional judgment, the court must determine whether, in light of all the circumstances, the

16   identified acts or omissions were outside the wide range of professionally competent assistance.

17   *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that

18   he was prejudiced by counsel's deficient performance.  *Strickland*, 466 U.S. at 693-94.

19   Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional

20   errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable

21   probability is "a probability sufficient to undermine confidence in the outcome."  *Id.*  The Ninth

22   Circuit has opined that this burden "represents a fairly low threshold."  *Riggs v. Fairman*, 399

23   F.3d 1179, 1183 (9th Cir. 2005) (citing *Sanders v. Ratelle*, 21 F.3d 1446, 1461 (9th Cir. 1994)

24   (stating that a "reasonable probability" is actually a lower standard than preponderance of the

25   evidence).

26   *////*

                                         7

1    The *Strickland* standards apply to claims of ineffective assistance of counsel involving

2    counsel's advice offered during the plea bargain process, including plea offers that lapse or are

3    rejected. *Missouri v. Frye*, ___ U.S. ___, 132 S.Ct. 1399 (2012); *Lafler v. Cooper*, ___ U.S. ___,

4    132 S.Ct. 1376 (2012); *Padilla v. Kentucky*, 559 U.S. ___, 130 S.Ct. 1473 (2009); *Hill v.*

5    *Lockhart*, 474 U.S. 52, 58 (1985); *Nunes v. Mueller*, 350 F.3d 1045, 1052 (9th Cir. 2003).

6    "During plea negotiations defendants are 'entitled to the effective assistance of competent

7    counsel.'" *Lafler*, 132 S.Ct. at 1384 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

8    As a general rule, "defense counsel has the duty to communicate formal offers from the

9    prosecution to accept a plea on terms and conditions that may be favorable to the accused."

10   *Frye*, 132 S.Ct. at 1408. *See also United States v. Blaylock*, 20 F.3d 1458, 1466 (9th Cir. 1994)

11   (a trial counsel's "failure to communicate the government's plea offer to his client constitutes

12   unreasonable conduct under prevailing professional standards."). Accordingly, when a defense

13   attorney allows a plea offer to expire without advising the defendant about the offer or allowing

14   him to consider it, "defense counsel did not render the effective assistance the Constitution

15   requires." *Frye*, 132 S.Ct. at 1408. "It is equally ineffective to fail to advise a client to enter a

16   plea bargain when it is clearly in the client's best interest." *United States v. Leoni*, 326 F.3d

17   1111, 1117 (9th Cir. 2003).

18   "A defendant has the right to make a reasonably informed decision whether to accept a

19   plea offer." *Turner v. Calderon*, 281 F.3d 851, 880 (9th Cir. 2002) (citations omitted). Trial

20   counsel must give the defendant sufficient information regarding a plea offer to enable him to

21   make an intelligent decision. *Id.* at 881. "[W]here the issue is whether to advise the client to

22   plead or not 'the attorney has the duty to advise the defendant of the available options and

23   possible consequences' and failure to do so constitutes ineffective assistance of counsel."

24   *Blaylock*, 20 F.3d at 1465 (quoting *Beckham v. Wainwright*, 639 F.2d 262, 267 (5th Cir.1981)).

25   Counsel is not "required to accurately predict what the jury or court might find." *Turner*,

26   281 F.3d at 881. *See also McMann*, 397 U.S. at 771 ("uncertainty is inherent in predicting court

8

1   decisions.").  Nor is counsel required to "discuss in detail the significance of a plea agreement,"

2   give an "accurate prediction of the outcome of [the] case," or "strongly recommend" the

3   acceptance or rejection of a plea offer.  *Turner*, 281 F.3d at 881.  Although counsel must fully

4   advise the defendant of his options, he is not "constitutionally defective because he lacked a

5   crystal ball."  *Id.*  The relevant question is not whether "counsel's advice [was] right or wrong,

6   but . . . whether that advice was within the range of competence demanded of attorneys in

7   criminal cases."  *McMann*, 397 U.S. at 771.

8        In order to show prejudice in the context of plea offers, "a defendant must show the

9   outcome of the plea process would have been different with competent advice."  *Lafler*, 132

10  S.Ct. at 1384.  Specifically, where a plea offer has lapsed or been rejected because of trial

11  counsel's deficient performance and the defendant has later accepted another, less favorable plea

12  offer,

13        defendants must demonstrate a reasonable probability they would
          have accepted the earlier plea offer had they been afforded
14        effective assistance of counsel.  Defendants must also demonstrate
          a reasonable probability the plea would have been entered without
15        the prosecution canceling it or the trial court refusing to accept it,
          if they had the authority to exercise that discretion under state law.
16        To establish prejudice in this instance, it is necessary to show a
          reasonable probability that the end result of the criminal process
17        would have been more favorable by reason of a plea to a lesser
          charge or a sentence of less prison time.

18

19  *Frye*, 132 S.Ct. at 1409.  Where a defendant claims that ineffective assistance of trial counsel led

20  him to accept a plea offer instead of proceeding to trial, a defendant must demonstrate "a

21  reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would

22  have insisted on going to trial."  *Hill*, 474 U.S. at 59.  And in cases where trial counsel's

23  defective advice caused the defendant to reject a plea offer and proceed to trial, prejudice is

24  demonstrated where "but for the ineffective advice of counsel there is a reasonable probability

25  that the plea offer would have been presented to the court (*i.e.*, that the defendant would have

26  accepted the plea and the prosecution would not have withdrawn it in light of intervening

9

1   circumstances), that the court would have accepted its terms, and that the conviction or sentence,

2   or both, under the offer's terms would have been less severe than under the judgment and

3   sentence that in fact were imposed." *Lafler*, 132 S.Ct. at 1385.

4                    **b.  <u>Analysis</u>**

5          After an independent review of the record, this court concludes that the state courts'

6   rejection of petitioner's claim of ineffective assistance of trial counsel is not contrary to or an

7   unreasonable application of federal law and should not be set aside.  Trial counsel advised

8   petitioner about the plea offer and its terms, discussed the viability of a motion to suppress, and

9   let petitioner make the decision whether to accept or reject the offer.  According to the cases

10  cited above, this course of action was "within the wide range of professionally competent

11  assistance." *Strickland*, 466 U.S. at 690.  This is not a case where counsel's failure to advise

12  petitioner of the sentence he faced if convicted prevented him from making an intelligent

13  decision about whether to accept the offer.  On the contrary, petitioner "was aware that he was

14  facing 25 years to life before the ten years offer was made." Traverse at 9.  *Cf.  Riggs v.*

15  *Fairman*, 399 F.3d 1179, 1181 (9th Cir. 2005) (trial counsel rendered ineffective assistance

16  during plea bargaining stage by failing to inform defendant that Three Strikes law might apply to

17  his case).  Nor is this a situation where counsel misinformed petitioner about the terms of the

18  plea agreement.  *Cf. Nunes*, 350 F.3d at 1049-50 (trial counsel rendered ineffective assistance in

19  misrepresenting the terms of the plea offer); *Blaylock*, 20 F.3d at 1465 (trial counsel rendered

20  ineffective assistance in failing to inform his client that the government had made a plea offer);

21  *Iaea v. Sunn*, 800 F.2d 861 (9th Cir. 1986) (trial counsel rendered ineffective assistance in

22  substantially misrepresenting the effect of a plea offer on defendant's sentence).  Rather,

23  petitioner was accurately advised of the terms of the plea offer and his possible sentence if he

24  was convicted after a trial, but chose not to accept the offer.

25          Although petitioner states his trial counsel overestimated the chances of success on a

26  motion to suppress, petitioner knew he was not guaranteed to prevail on such a motion.  Indeed,

1  as set forth above, petitioner told his trial counsel he was "afraid of losing" the motion.  Pursuant

2  to the authorities cited above, petitioner's arguments that his trial counsel was overly optimistic

3  about the chances for success of a motion to suppress, or that he acted improperly in not forcing

4  petitioner to accept the offer, do not establish ineffective assistance of counsel.  *See*

5  *Sophanthavong v. Palmateer*, 378 F.3d 859, 868 (9th Cir. 2004) ("[E]rroneous predictions . . .

6  are deficient only if they constitute 'gross mischaracterization of the likely outcome' of a plea

7  bargain 'combined with . . . erroneous advice on the probable effects of going to trial.'")

8  (citations omitted); *Iaea*, 800 F.2d at 865 (a "mere inaccurate prediction, standing alone, would

9  not constitute ineffective assistance.").  Under the circumstances presented here, there was no

10  "gross error" on the part of counsel such that the advice petitioner was given was "so insufficient

11  that it undermined his ability to make an intelligent decision about whether to accept the [plea]

12  offer."  *Turner*, 281 F.3d at 880-81 (citing *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992);

13  *McMann*, 397 U.S. at 772.  Accordingly, petitioner is not entitled to relief on this claim.

14       Nor is petitioner entitled to an evidentiary hearing.  Pursuant to 28 U.S.C. § 2254(e)(2),

15  an evidentiary hearing is appropriate under the following circumstances:

16       (e)(2) If the applicant has failed to develop the factual basis of a
         claim in State court proceedings, the court shall not hold an
17       evidentiary hearing on the claim unless the applicant shows that-

18            (A) the claim relies on-

19            (I) a new rule of constitutional law, made retroactive to cases on
              collateral review by the Supreme Court, that was previously
20            unavailable; or

21            (ii) a factual predicate that could not have been previously
              discovered through the exercise of due diligence; and
22
23            (B) the facts underlying the claim would be sufficient to establish
              by clear and convincing evidence that but for constitutional error,
              no reasonable fact finder would have found the applicant guilty of
24            the underlying offense;

25  28 U.S.C. § 2254(e)(2).

26  ////

11

1      Under this statutory scheme, a district court presented with a request for an evidentiary

2 hearing must first determine whether a factual basis exists in the record to support a petitioner's

3 claims and, if not, whether an evidentiary hearing "might be appropriate." *Baja v. Ducharme*,

4 187 F.3d 1075, 1078 (9th Cir. 1999).  *See also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir.

5 2005); *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005).  A federal court must

6 take into account the AEDPA standards in deciding whether an evidentiary hearing is

7 appropriate.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  A petitioner must also "allege[]

8 facts that, if proved, would entitle him to relief."  *Schell v. Witek*, 218 F.3d 1017, 1028 (9th Cir.

9 2000).[4]

10     The court concludes that no additional factual supplementation is necessary and that an

11 evidentiary hearing is not appropriate with respect to this claim.  Petitioner has not "raised any

12 factual disputes regarding counsel's performance that require resolution in an evidentiary

13 hearing, and that, if decided in his favor, would entitle him to relief."  *West v. Ryan*, 608 F.3d

14 477, 489 (9th Cir. 2010).  In addition, for the reasons described above, petitioner has failed to

15 demonstrate that the state courts' decision on his claims is contrary to or an unreasonable

16 application of clearly established federal law under § 2254(d)(1), or based on an unreasonable

17 determination of the facts under § 2254(d)(2).  *See Pinholster*, 131 S. Ct. at 1412.  Accordingly,

18 an evidentiary hearing is not necessary or appropriate in this case.

19                **2.  Fourth Amendment**

20     In claim two, petitioner alleges that Officer Brown pulled him over because petitioner is

21 black and Officer Brown is a "racist and a liar."  Petition at 4; Traverse at 14.  In claim three,

22 petitioner argues that his conviction should be reversed because the search of his person

23 conducted by Officer Brown was improper and unlawful.  Petition at 5; Traverse at 16-17.

24

25     [4]  The Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review.

26 *Cullen v. Pinholster*, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398, 1400 (2011).

1   In claim four, petitioner argues that the "fruits" of the unlawful stop and search must be

2   suppressed.  Petition at 5; Traverse at 18.  By these allegations, petitioner is claiming that his

3   conviction was obtained through the use of evidence obtained in violation of the Fourth

4   Amendment.

5          The United States Supreme Court has held that "where the State has provided an

6   opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be

7   granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional

8   search or seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 494 (1976).  There

9   is no evidence before the court that petitioner did not have a full and fair opportunity to litigate

10  his Fourth Amendment claims in state court.  On the contrary, he filed and litigated a motion to

11  suppress in the trial court.  Clerk's Transcript on Appeal (CT) at 82-104; RT at 3-67.

12  Accordingly, petitioner's Fourth Amendment claim is barred in this federal habeas proceeding.

13  *Stone*, 428 U.S. at 494.

14                  **3.  Ineffective Assistance of Appellate Counsel**

15         Petitioner claims that his appellate counsel rendered ineffective assistance in failing to

16  raise petitioner's Fourth Amendment and ineffective assistance of trial counsel claims on direct

17  appeal.  Petition at 6; Traverse at 19.

18         The *Strickland* standards apply to appellate counsel as well as trial counsel.  *Smith v.*

19  *Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

20  However, an indigent defendant "does not have a constitutional right to compel appointed

21  counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

22  professional judgment, decides not to present those points."  *Jones v. Barnes*, 463 U.S. 745, 751

23  (1983).  Counsel "must be allowed to decide what issues are to be pressed."  *Id*.  Otherwise, the

24  ability of counsel to present the client's case in accord with counsel's professional evaluation

25  would be "seriously undermined."  *Id. See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th

26  Cir. 1998) (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and

                                        13

1  is not even particularly good appellate advocacy"); *Pollard v. White*, 119 F.3d 1430, 1435 (9th

2  Cir. 1997) ("A hallmark of effective appellate counsel is the ability to week out claims that have

3  no likelihood of success, instead of throwing in a kitchen sink full of arguments with the hope

4  that some argument will persuade the court").  There is, of course, no obligation to raise

5  meritless arguments on a client's behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a

6  showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

7  to raise a weak issue.  *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this

8  context, petitioner must demonstrate that, but for counsel's errors, he probably would have

9  prevailed on appeal.  *Id*. at 1434 n.9.  To properly address a claim of ineffective assistance of

10  appellate counsel for failing to raise an issue on appeal, a habeas court must look to the merits of

11  the omitted issue(s).  *Moormann v. Ryan*, No.  08-99035, 2010 WL 4968707, * 4 (9th Cir.  Dec.

12  8, 2010).

13          For the reasons set forth above, petitioner's Fourth Amendment claims or his claim of

14  ineffective assistance of trial counsel lack merit.  Petitioner's appellate counsel had no obligation

15  to raise meritless issues on appeal.  *Strickland*, 466 U.S. at 687-88; *Moormann*, 2010 WL

16  4968707, at *4.  Counsel's decision to raise other issues that he believed, in his professional

17  judgment, had more merit than these claims was "within the range of competence demanded of

18  attorneys in criminal cases."  *McMann*, 397 U.S. at 771.  In addition, petitioner has failed to

19  establish that, but for counsel's errors, he probably would have prevailed on appeal.  It is

20  noteworthy in this regard that petitioner's claims of ineffective assistance of trial counsel and

21  Fourth Amendment violations were denied in state court in connection with petitioner's habeas

22  corpus petitions.  Accordingly, petitioner is not entitled to relief on his claim of ineffective

23  assistance of appellate counsel.

24  ////

25  ////

26  ////

14

### 4. <u>Prosecutor's Use of Peremptory Challenges</u>

In claims six through nine, petitioner alleges that his constitutional rights were violated by the prosecutor's improper use of peremptory challenges to exclude two African Americans from the jury, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

### a. <u>State Court Decision</u>

The California Court of Appeal rejected petitioner's *Batson* claim, reasoning as follows:

**Denial Of The Wheeler/Batson Motions**

Defendant contends the trial court erred in denying his motion challenging the prosecutor's peremptory challenges of two black jurors: Jurors Nos. 2 and 3.[5] Neither Juror No. 2 nor Juror No. 3 were in the initial group of jurors; both were brought in as replacements after others had been dismissed. Juror No. 1 was seated on the panel before the attorneys' began their questioning. Jurors Nos. 2 and 3 were seated in the jury box after the first round of peremptory challenges. Along with them, Jurors Nos. 4 and 5 were added as well. Juror No. 6 was added to the jury panel after Juror No. 2 was excused.

After Jurors Nos. 2 and 3 were peremptorily challenged by the prosecution, Juror No. 6, also a black male, was excused by the court for cause. He was excused due to his connections to law enforcement and his concerns about being able to judge defendant fairly given those connections. Neither party contends the court erred in excusing Juror No. 6; however, each references the chronology to help determine if there was a racial bias in the jury selection. The pertinent portions of the voir dire were as follows:

**A**

**Juror No. 2**

The prosecutor asked the prospective jurors if "anybody here feel[s] that our criminal justice system treats African Americans differently than other races or people in our society?" Several jurors responded that the disparities in treatment were because of economic reasons. Others stated they had no opinion.

Juror No. 2 replied, "Yes. I don't feel that based on the overall that it is equal for all people. Like the young lady stated, if you have a lot of money, you can afford a better attorney or if you

---

[5] For simplicity, we will refer to the jurors by number. The numbers are assigned chronologically by when each was added to the jury panel.

don't, you don't.  But even some of the laws, I think they're geared for either the poorer or richer class.  [¶]  You know, for instance like, you know, even cocaine.  You know, they have one law for powder cocaine and one for crack.  You can have an ounce of powder and have a lesser sentence for having, say, a gram of, you know something else.  So in that case, you would have a person, most likely in a black community, have crack cocaine than have an ounce of, you know, cocaine, and based on that, you know, there are different laws for whomever decides to make them.  [¶]  You know, that does affect different classes differently based on their, you know, usually just their financial status."

After finishing voir dire, the prosecutor peremptorily challenged Juror No. 2. Defendant objected and brought a *Wheeler* challenge to the dismissal.  Defendant argued the prosecutor had questioned Juror No. 2 "[and] as soon as he got a little bit of information that he wanted, enough to excuse a black juror, that he did so." The court stated, "[defendant] established some prima facie showing . . . but let me ask [the prosecutor] if – just on the issue of the prima facie showing, why don't you respond."

The prosecutor stated, "I would not have used my peremptory challenge to remove [Juror No. 2] but for his answers that he provided upon my questions.  My questioning was do any of you believe that the criminal justice system treats African American people unfairly or differently.  [¶]  It wasn't society or it wasn't even the Court but the criminal justice system and [Juror No. 2]'s statements and answers exceeded and expanded upon what some of the other jurors said.  What [Juror No. 2] said was not only the economic reasons or economic factors as a reason for any disparity in treatment but he also went on to talk about the difference between crack cocaine and simple powder cocaine.  [¶]  As an example, where one person has an ounce of cocaine, powdered cocaine, versus somebody who has crack cocaine and that crack cocaine is a drug that's predominantly used in the African American Community.  [¶]  And as such that the law and the [L]egislature have treated it unfairly or differently in that situation. So he has given an example dealing with crack cocaine and cocaine and how African American jurors or that segment of society is treated differently in our criminal justice system.  [¶] And in this case, the drug that we have involved here is indeed crack cocaine not powder cocaine.  Not methamphetamine but indeed crack cocaine.  And so the basis of my exclusion was in regards to his answers in that area, and that based upon his personal feelings and what he perceives as whatever knowledge he has, whether that be a little bit or a lot, will taint and affect his perception and view of how a case is prosecuted and how it is dealt with in the criminal system and how a particular African American individual may be dealt with because of that.  [¶]  And so it has nothing to do with race but [Juror No. 2]'s answers.  And I believe

16

I have established a non-racial reason for my challenge of [Juror No. 2]."

The trial court then stated, "Well, I note that [Juror No. 2] was the – actually the only person [who] attached race to any of the responses to the question. Everyone else seemed to be talking about financial position or things of that nature. I didn't hear anybody else talk about race other than [Juror No. 2]. So I don't find that there was a prima facie showing. [¶] Even if there was a prima facie showing, the People have established their reason other than race for his exclusion. If anybody established a race, anything about race, it was [Juror No. 2]. [¶] There is – I also note that I think [another juror] was African American as well, and she was actually excluded by the defense. She was one of the early on prospective jurors in this panel."

**B**

**Juror No. 3**

After Juror No. 2 was seated, the judge questioned the new jurors regarding their experiences with the justice system. Juror No. 4 stated that defendant would not want a jury with 12 jurors like her on it. When asked why, she responded, "Because I believe he's probably guilty . . . . [¶] . . . Because just from the charges that were read, I believe he's probably guilty. I think trials like this clog up the justice system. They should be pled out, and he probably should have done time served for the last year and been released. Gone on with it, and we shouldn't have wasted all these taxpayer's time and energy sitting here wasting two and a half days for something that could have been pled out." The court dismissed her from the panel for cause.

The court then questioned Juror No. 5 about his experiences with law enforcement. During the questioning, Juror No. 5 stated, "[o]ne other item is my friend, my good friend was – we were in a city out of state. He was – well, the story goes he was in the wrong part of town. He was taken by the local police officer, pistol whipped and thrown in jail, but eventually the charges were dropped."

After dismissing several other jurors, including Juror No. 1, the prosecutor dismissed Juror No. 3 using a peremptory challenge. After removing the jurors from the courtroom, the court stated, "All right. We're out of the presence of the other prospective jurors, and the People just exercised a challenge to [Juror No. 3], who is an African American male. [¶] And [defense counsel] again had *Wheeler*ed the Prosecution, and at this point I'm going to find a prima facie showing, so you're going to have to explain yourself."

////

The prosecutor replied, "I used my peremptory challenge against [Juror No. 3] for several reasons. [¶] First of all, when one of the prospective jurors, I believe it was [Juror No. 4] . . . spoke with the Court about how cases at this level, drug possession cases are clogging up the court system and how they should go ahead and plead. [¶] I saw [Juror No. 3] . . . roll his eyes, shake his head and look over at [Juror No. 4]. [¶] He also had his mouth gaped in one moment as well, and he looked upset with her. The other juror – there was another prospective juror, [Juror No. 1]. She was at the time seated in seat number 11. I believe seat number 11. [¶] And when [Juror No. 4] made those comments, I looked at all the jurors and their reactions, and [Juror No. 1] shook her head in disapproval at [Juror No. 4]'s comment. [¶] I had removed [Juror No. 1] from the panel with my exercise of my peremptory challenge. She's [C]aucasian not African American or minority. [¶] Furthermore, [Juror No. 3], when [Juror No. 5] spoke, [he] had mentioned how a friend of his was in a bad part of town and got picked on by the police. [¶] The moment that [Juror No. 5] mentioned bad part of town, I saw [Juror No. 3]'s reaction. His face was frowning. He looked upset and angry and also shook his head at [Juror No. 5]'s comments. [¶] My analyses and reason for exercising my challenge is that [Juror No. 3] seems to be sensitive towards certain issues and not patient or tolerant with the other jurors and their opinions . [¶] My job in regards to picking a jury, I want a jury that can get along, a jury that will be patient with each other, a jury that is tolerant, a jury that's not going to be overly sensitive at every comment or expression stated by the other prospective jurors. [¶] If the jury gets angry and upset and is sensitive, that juror may become entrenched in their views or take an opposite view creating a possibility of a hung jury. [¶] My basis of exclusion for [Juror No. 3] and [Juror No. 1] was not based upon race but rather upon the reactions to questions that other jurors answered in the Court's question. [¶] And just for the record, there is another African American juror [who] is currently on the panel. I believe that's [Juror No. 6], and he's – and I do not plan to excuse him in anyway from this panel in light of the questions that he's answered and his demeanor."

Defense counsel responded, "Well, I wouldn't expect him to exclude [Juror No. 6]. He comes from a law enforcement family and his remarks were that he would probably favor law enforcement if one was testifying from the stand. [¶] I'll ask the Court – or at least I noticed when that outburst came out of Juror . . ., if that's who it was, about how it was a waste of court time, I didn't see anything from [Juror No. 3]. But I did see other jurors smirk, tip their heads, back look at each other and make all kinds of reactions to that comment. [¶] That would be natural with the outburst that came out of that juror. To single out [Juror No. 3] as a result to that seems disingenuous to me, your Honor. [¶] The fact is that I have been watching the jury pretty cautiously looking for any kind of nuance that we can use in picking a jury. I didn't

see any of the things that the Prosecution saw whatsoever.  [¶]  I'm not saying he didn't see it, but I certainly didn't see it.  The fact that somebody frowns over somebody making an outburst in court doesn't seem unreasonable to me.  [¶]  The fact of the matter is, we're down to one African American in this panel, and he's pro-law enforcement.  And I don't think that anything that the Prosecution has said amounts to a reason to exclude under *Wheeler* or the pursuing cases."

The court then questioned the prosecutor about his reasons for dismissing Jurors Nos. 1 and 3.  The prosecutor explained that he had dismissed Juror No. 1 for "the same reason [he] excluded [Juror No. 3].  It was her physical reaction.  I looked at the jurors.  Every single one of them I scanned from the top row to the middle and the bottom when that comment, that outburst came out.  [¶]  And I saw two reactions and two reactions only, and I noted those reactions down."  The court then asked about Juror No. 5's comment.  The prosecutor stated, "And it was when [Juror No. 5] mentioned, and he was seated immediately to the left of [Juror No. 3], mentioned the word[s] 'bad part of town' and talked about the scenario, I saw [Juror No. 3]'s reaction.  So it wasn't on just one reaction to a comment but on two reactions."

The trial court then found there had been a prima facie showing, but the People had stated sufficient grounds to overcome the *Wheeler* motion.  However, the court cautioned the prosecutor, "you're getting very close, and this is the situation where that's something I would – I'm actually very close to entertaining granting it.  But based upon your representations that you are observing the reactions of these various jurors and their – and you're excluding other folks for like reactions that I deny the motion."

## II

**The Court Did Not Abuse Its Discretion In Denying The Motions**

"Prospective jurors may not be excluded from jury service based solely on the presumption that they are biased because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds.  [Citations.]  A defendant bears the burden of establishing a prima facie case of *Wheeler* error.  [Citation.]  If the court finds a prima facie case has been shown, the burden shifts to the prosecution to provide race-neutral reasons for the questioned peremptory challenges.  [Citation.]  The prosecutor need only identify facially valid race-neutral reasons why the prospective jurors were excused.  [Citations.]  The explanations need not justify a challenge for cause.  [Citation]  'Jurors may be excused based on "hunches" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on

19

impermissible group bias.'" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122.)  "Once a trial court has made a sincere and reasoned effort to evaluate each of the stated reasons for a challenge to a particular juror, we accord great deference to its conclusion." (*Id.* at p. 1126.)

Defendant claims the trial court erred when it denied the Wheeler motions because: "1. it based its decision on an inadequate record; 2. it failed to recognize[ ] the prosecutor's justification was a sham; and, 3. it upheld a challenge based on a[n] erroneous factual conclusion."

**Juror No. 2**

When defendant raised a *Wheeler* objection to the prosecution's excusal of Juror No. 2, the trial court expressly found no prima facie case.  Nonetheless, the court allowed the prosecutor to state his reasons for the peremptory challenge on the record.  Despite allowing the prosecutor to justify the challenge, the trial court did not, by that action, create a situation constituting an implied finding of a prima facie case.  (*People v. Davenport* (1995) 11 Cal.4th 1171, 1200.)

"It bears emphasizing that a match in the skin color between a defendant and a prospective juror does not preclude a peremptory excusal on grounds that the juror exhibited sympathy or bias either for or against the defendant who is of the same race.  What *Batson* and *Wheeler* prohibit is excusal of a juror on the basis of 'group bias,' i.e., the assumption that a member of a particular group will, because of such membership, harbor particular attitudes or biases.  'A party does not offend *Batson* or *Wheeler* when it excuses prospective jurors who have shown orally or in writing, or through their conduct in court, that they personally harbor biased views.'" (*People v. Stanley* (2006) 39 Cal.4th 913, 939-940.)  We defer to the trial court's judgment that no prima facie case was established.

Defendant argues, however, that the trial court committed a factual error when upholding the challenge to Juror No. 2.  While ruling on the *Wheeler* objection, the trial court stated, "I note that [Juror No. 2] was the – actually the only person [who] attached race to any of the responses to the question . . . .  I didn't hear anybody else talk about race other than [Juror No. 2] . . . .  [¶] . . . If anybody established a race, anything about race, it was [Juror No. 2]."

Defendant seizes upon the last sentence to show the trial court committed factual error.  He claims "[t]he question presented to [Juror No. 2] asked if African Americans were treated differently in our justice system.  The court ruled that if 'anybody established a race, anything about race, it was [Juror No. 2].'  This is factually incorrect.  The question itself was about race."

Viewing the trial court's entire statement, it is clear that the trial court was referring to the prospective jurors' answers to the prosecution's question, not the question itself.  The court stated, "I note that [Juror No. 2] was the – actually the only person [who] attached race to any of the responses to the question . . .   I didn't hear anybody else talk about race other than [Juror No. 2] . . . .  [¶] If anybody established a race, anything about race, it was [Juror No. 2]."  We do not find any factual error in the court's ruling.  Therefore, we conclude the trial court did not err in denying the *Wheeler* motion regarding Juror No. 2.

**B**

**Juror No. 3**

Defendant argues the trial court erred by accepting the prosecutor's use of body language to justify excusing Juror No. 3.  Defendant argues this was a "sham" justification.  To support this, defendant states, "the prosecutor waited too long to make the challenge based on body language for that challenge to have any legitimacy.  Had [Juror No. 3]'s body language been a genuine basis for excusing him, the prosecutor would have brought the challenge immediately after making the observation; the prosecutor would not have waited until the very end of the jury selection process to excuse [Juror No. 3]."

Although Juror No. 3's demeanor is not apparent on the face of the record on appeal, the trial court certainly was in a position to evaluate whether that factor could have played a legitimate role in the prosecutor's peremptory challenge of Juror No. 3.  "[S]ubjective factors, not apparent on the record or easily articulable, may legitimately play a critical role in an attorney's exercise of a peremptory challenge."  (*People v. Jackson* (1996) 13 Cal.4th 1164, 1249.)  Further, "'[s]ince the trial court was in the best position to observe the prospective jurors' demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor's reasons for excusing [the prospective jurors], including the demeanor-based reason, were sincere and genuine, is entitled to "great deference" on appeal.'"  (*People v. Stanley* (2006) 39 Cal.4th 913, 939.)

The timing of the prosecutor's challenge does not compel us to overturn the trial court's finding that the challenge was not race-based either.  An attorney may exercise peremptory challenges based on a jury as a whole, not just evaluating each individual juror in a vacuum.  In *People v. Wright* (1990) 52 Cal.3d 367, our Supreme Court held "[i]t is clear that knowledge of the composition of the entire panel can be relevant to the informed exercise of a peremptory challenge against a particular juror."  (*Id.* at p. 397; *see also In re Mendes* (1979) 23 Cal.3d 847

21

[the Supreme Court held that a trial court did not err when it reopened jury selection and allowed the use of any unused peremptory challenges after the jury panel was accepted when one of the jurors was discharged due to a death in the family].)

We also note there was one remaining African-American juror on the panel, Juror No. 6, after Juror No. 3 was dismissed. "While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection." (*People v. Turner* (1994) 8 Cal.4th 137, 168.) Juror No. 6 was eventually removed by the court due to his multiple connections to law enforcement. While Juror No. 6's presence until that point does not negate a *Wheeler* motion, it does suggest the prosecutor was looking at the individual jurors for their backgrounds and beliefs rather than solely their race.

Because there is substantial evidence in the record to support the trial court's findings, we conclude the court did not err in denying defendant's *Wheeler* motions.

**The Court Did Not Rule On An Inadequate Record**

Defendant also contends "the court made its ruling based on an inadequate record. Neither of the two excused African American jurors was questioned concerning any perceived bias they may have had. Without this factual foundation, the trial court could not properly have evaluated the justification offered by the prosecutor and could not have determined if the two jurors had been improperly excluded. As a consequence, the trial court erred even when measured against the strict standard of deference accorded it."

He argues the trial court erred when it "denied the motion without examining any of the excused jurors, further questioning the prosecutor or allowing defense counsel to make a more detailed review . . . . [¶] [Juror No. 3] was never asked if he was rolling his eyes at the other jurors and, if so, why he was doing it. [Juror No. 2] was never asked what he meant by his statement in response to the question about the treatment of African Americans in the judicial system. Without the answers to these unasked question, the trial could not properly have determined if the prosecutor's explanation was genuine or a sham – any meaningful examination was impossible because of the severe lack of a factual foundation."

Defendant's argument that the trial court must clarify a juror's response through further questioning is incorrect. Our Supreme Court held in *People v. Jackson, supra*, 13 Cal.4th at pages 1197-1198, that *Wheeler* does not require the trial court to conduct additional inquiry into the prosecutor's race-neutral justification if

22

it is "satisfied from its observations that any or all of them are proper." "Where . . . the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible [citation], and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed findings regarding the reason for the exercise of each such peremptory challenge." (*People v. Reynoso* (2003) 31 Cal.4th 903, 929.)

The trial court made a sincere and reasoned evaluation of the prosecutor's reasons. It asked for a race-neutral reason and questioned the prosecutor regarding that justification. It probed the circumstances leading to Juror No. 3's dismissal, and noted that the prosecutor had removed Juror No. 1 (a Caucasian woman) at the same time for the same reason.

While we recognize the trial court stated the prosecutor was "getting very close" to violating *Wheeler*, this supports the fact that the trial court was making a sincere and reasoned effort to evaluate the prosecutor's reasons. After cautioning the prosecutor that he was close to violating *Wheeler*, the court did a further inquiry into whether the lawyers planned to dismiss any more jurors. The prosecutor specifically stated he would be exercising one more challenge, to another Caucasian woman.

Opinion at 2-18.

### b.  Legal Standards Regarding Petitioner's Batson/Wheeler Claim

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. *See Batson*, 476 U.S. at 79; *Johnson v. California*, 545 U.S. 162 (2005). So-called *Batson* claims are evaluated pursuant to a three-step test:

First, the movant must make a prima facie showing that the prosecution has engaged in the discriminatory use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." [Citation

23

1
2
3
4

> omitted.]  Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question.  [Citation omitted.]  Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

5 *Tolbert v. Page*, 182 F.3d 677, 680 (9th Cir. 1999) (en banc).

6          In order to establish a prima facie case of racial discrimination, petitioner must show that

7 "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a

8 peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

9 inference that the strike was motived by race."  *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir.

10 2006) (citing *Batson*, 476 U.S. at 96 and *Cooperwood v. Cambra*, 245 F.3d 1042, 1045-46 (9th

11 Cir. 2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of

12 evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory

13 purpose.'"  *Johnson*, 545 U.S. at 169 (quoting *Batson*, 476 U.S. at 94.)  In evaluating whether a

14 defendant has established a prima facie case, a reviewing court should consider the "'totality of

15 the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike."  *Boyd*,

16 467 F.3d at 1146 (quoting *Batson*, 476 U.S. at 94, 96).  This should include a review the entire

17 transcript of jury voir dire in order to conduct a comparative analysis of the jurors who were

18 stricken and the jurors who were allowed to remain.  *Id.* at 1050 ("We believe, however, that

19 Supreme Court precedent requires a comparative juror analysis even when the trial court has

20 concluded that the defendant failed to make a prima facie case").  *See also Miller-El v. Dretke*,

21 545 U.S. 231 (2005) (utilizing comparative analysis, in a case in which a prima facie showing

22 had been made, to determine whether the prosecutor had been motived by racial bias in

23 exercising peremptory challenges).[6]

24

_____

25          [6]  Comparative juror analysis refers to "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise
26 similar jurors differently because of their membership in a particular group."  *Boyd*, 467 F.3d at

1    At the second step of the *Batson* analysis, "the issue is the facial validity of the

2    prosecutor's explanation." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). "A neutral

3    explanation in the context of our analysis here means an explanation based on something other

4    than the race of the juror." *Id.* at 360. "Unless a discriminatory intent is inherent in the

5    prosecutor's explanation, the reason offered will be deemed race-neutral." *Stubbs v. Gomez*, 189

6    F.3d 1099, 1105 (9th Cir. 1999) (quoting *Hernandez*, 500 U.S. at 360). For purposes of step

7    two, the prosecutor's explanation need not be "persuasive, or even plausible." *Purkett v. Elem*,

8    514 U.S. at 765, 768 (1995). Indeed, "to accept a prosecutor's stated nonracial reasons, the court

9    need not agree with them." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006). "It is not until

10   the *third* step that the persuasiveness of the justification becomes relevant--the step in which the

11   trial court determines whether the opponent of the strike has carried his burden of proving

12   purposeful discrimination." *Purkett*, 514 U.S. 765, 768 (1995) (emphasis in original).

13   The question is whether, after an evaluation of the record pertaining to that particular case, the

14   prosecutor's race-neutral explanation for a peremptory challenge should be believed. *Id.*

15   In the third step of a *Batson* challenge, the trial court has "the duty to determine whether

16   the defendant has established purposeful discrimination," *Batson*, 476 U.S. at 98, and, to that

17   end, must evaluate the "persuasiveness" of the prosecutor's proffered reasons. *See Purkett*, 514

18   U.S. at 768. In determining whether petitioner has carried this burden, the Supreme Court has

19   stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct

20   evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v.*

21   *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Hernandez*, 500 U.S. at 363.

22   "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for

23   purposeful discrimination." *Purkett*, 514 U.S. at 768. *See also Lewis v. Lewis*, 321 F.3d 824,

24   

25   1145. *See also Miller-El*, 125 S.Ct. at 2325 (stating that "side-by-side comparisons of some
     black venire panelists who were struck and white panelists allowed to serve" was "more
26   powerful" than bare statistics).

830 (9th Cir. 2003) ("[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.") In step three, the court "considers all the evidence to determine whether the actual reason for the strike violated the defendant's equal protection rights." *Yee v. Duncan*, 463 F.3d 893, 899 (9th Cir. 2006). "A court need not find all nonracial reasons pretextual in order to find racial discrimination." *Kesser*, 465 F.3d at 360.

The defendant in the criminal prosecution bears the burden of persuasion to prove the existence of unlawful discrimination. *Batson*, 476 U.S. at 93. "This burden of persuasion 'rests with, and never shifts from, the opponent of the strike.'" *Id.* at 2417 (quoting *Purkett*, 514 U.S. at 768). However, "the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson,* 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953).

### c. **Analysis**

Below, the court addresses petitioner's arguments with regard to both excused jurors.

### I. **Juror No. 2**

Petitioner challenges the trial court's conclusion that he failed to establish a prima facie case of racial discrimination in connection with the prosecutor's strike of Juror No. 2.[7]  As set forth above, although the trial court found no prima facie case it nonetheless asked the prosecutor to respond to the *Batson* challenge with regard to his dismissal of Juror No. 2. Curiously, the prosecutor argued that the reason for the peremptory challenge to Juror No. 2 "has *nothing to do with race* but [the juror's] answers.  And I believe I have established a non-racial reasons for my challenge . . . ." ART at 162.  Yet, the question the prosecutor asked Juror No. 2

---

[7]  The Reporter's Transcript of voir dire identifies the juror involved in this claim as Juror No. 9, whereas the California Court of Appeal identifies the juror as Juror No. 2.  *See* Augmented Reporter's Transcript on Appeal (ART) at 158.  This court will follow the lead of the Court of Appeal in referring to the juror in question as Juror No. 2

to answer is obviously a race-based question.  The prosecutor asked the jurors, for some

unexplained purpose, whether "anybody here feel[s] that our criminal justice system *treats*

*African Americans differently than other races* or people in our society?"  *Id.* at 152.  Unhappy

with Juror No. 2's response, the prosecutor used a peremptory challenge and removed Juror No.

2, who is African American.  Juror No. 2 answered the question affirmatively and, when

explaining why, gave an example as a basis for his belief.  The defense objected to the

prosecutor's removal of Juror No. 2 and the trial court head the prosecutor's response.  The trial

judge concluded that petitioner had failed to demonstrate even a prima facie case that the

peremptory was based on racial grounds.  ART at 163.  The trial judge stated, erroneously, that:

> Well, I note that [Juror No. 2] was the – actually the *only* person
> that attached race to any of the responses to the question.
> Everyone else seemed to be talking about financial position or
> things of that nature.  *I didn't hear anybody else talk about race*
> other than [Juror No. 2].  So I don't find that there has been a
> prima facie showing.
>
> Even if there was a prima facie showing, the People have
> established their reason other than race for his exclusion.  If
> anybody established a race, anything about race, it was [Juror No.
> 2].
>
> There is – I also note that I think Ms. Clay was African American
> as well, and she was actually excluded by the defense.  She was
> one of the early on prospective jurors in this panel.

*Id.* (emphasis added).  Clearly, the juror was not the only person that attached race to any of the

responses to the question nor was he the only one in the courtroom to talk about race.  Race was

the very call of the question by the prosecutor.  It could not have been answered without

attaching race to the response.  There is simply no way to reconcile the trial judge's statement

with the statements in the record by the prosecutor and Juror No. 2.[8]  Obviously, the prosecutor

brought up and introduced into the voir dire colloquy the matter of race.  The premise of his

---

[8]   The trial judge's statement that "I didn't hear anybody else talk about race other than
Mr. Cross" suggests that the judge simply did not hear or understand the question asked by the
prosecutor.  The statement is factually incorrect.

1    question shows that the prosecutor specifically had race in mind in questioning the jurors.  The

2    prosecutor elicited a response to his own race-based question and then removed the African

3    American juror because of his response.

4           When denying that his motive for doing so had anything "to do with race," ART at 162,

5    the prosecutor pointed to the juror's response to the very racially premised question and argued

6    that the response somehow forms a "non-racial reason for my challenge of [Juror No. 2]."  *Id.*

7    The record does not suggest any non-racial relevance for the question.  Nor does the record

8    reflect any concern by the prosecutor that jurors who were not African American might believe

9    that the criminal justice system treats persons of their race differently than other races.  Nor does

10   the prosecutor's attempt to tie his inquiry as to juror's feelings about whether African Americans

11   are generally treated fairly to the question the trial court asked initially establish a legitimate

12   non-racial purpose for the question.  The trial judge asked the panel in general: "Do any of you

13   feel that you have any type of personal prejudice [against] persons [of] other races, ethnic

14   backgrounds or lifestyles that would interfere in anyway with your ability to judge this case

15   fairly as all witnesses and parties."  ART at 83 - 84.  No juror responded that they did.  The

16   prosecutor, however, asked a very different question that singled out African Americans

17   specifically, and then exercised a peremptory challenge to remove an African American juror.

18   These circumstances call out for an explanation, and unless credibly explained with a legitimate

19   non-racial purpose, raise an inference that Juror No. 2's race was a factor in the prosecutor's

20   decision to remove Juror No. 2.  Contrary to the conclusion by the trial judge, a prima facie case

21   had been established.

22          On appeal, the California Court of Appeal simply deferred to the trial court's judgment

23   that no prima facie case of racial discrimination was established with respect to Juror No. 2.

24   Opinion at 12.  The appellate court placed its focus on the juror's answer rather than the

25   prosecutor's question and found that the trial court's decision was not based on a factual error.

26   *Id.* at 13-14.  Yet to reach that result one must simply re-write and read out of the transcript of

the prosecutor's question (to which Juror No. 2 was responding) the words "African Americans" and "other races."  Of course, doing so renders the question unintelligible because it removes from the statement the very point of the question.

Juror No. 2 was a member of a "cognizable racial group" and the prosecutor used a peremptory strike to remove him, thereby satisfying the first two prongs of the analysis with respect to the establishment of a prima facie case of racial discrimination.  Furthermore, the totality of the circumstances raise an inference that the strike was, indeed, motived by race.

Although the trial court concluded that a prima facie case had not been established, the prosecutor nonetheless offered the explanation that he excused Juror No. 2 because the juror's answer implied that prosecutions involving crack cocaine were sometimes unfair to persons in the black community.  If that response was intended to negate any inference that race was a motivating factor for striking the juror from the panel, the explanation is wanting.  The prosecutor noted that Juror No. 2 had "exceeded and expanded upon what some of the other jurors said" when he mentioned not only poverty but also the differences in prosecutions involving crack cocaine, which was "predominantly used in the African American Community."[9] ART at 161.  Yet the prosecutor never attempted to explain why the race-based question was legitimately posed in the first instance, nor did the trial court require the prosecutor to explain what legitimate non-racial purpose there was for the question.  The question and the prosecution's strike of Juror No. 2 were inextricably intertwined; according to the prosecutor's own admission it formed the basis for his use of the peremptory challenge to remove the juror.

////

---

[9]  There is nothing in the colloquy between the prosecutor and Juror No. 2 regrading discrepant penalties for powder and crack cocaine that suggests that the juror had any bias against the prosecution of either.  Nor did the prosecutor explore that concern with the juror.

In short, the point made by the excluded juror was that the discrepant penalties were an example of what the prosecutor had inquired about.  Significantly, Juror No. 2 closed his answer with the comment: "You know, that does affect different classes differently based on their, you know, usually just their financial status."  RT at 154.

1   Under the circumstances, the burden should have been placed on the prosecutor to explain not

2   only the challenge but the legitimate non-racial purpose for the race-based question that invited

3   the response used to remove the juror.  Whether a race-neutral purpose could have been

4   persuasively provided is problematic, but ultimately is unknown because the prosecutor was

5   never required to explain it.

6          The court also notes that Juror No. 2 was apparently the first African-American juror

7   stricken by the prosecutor.[10]  Further, the prosecutor was willing to accept the jury with one

8   African American member (Juror No. 6), although that juror was later dismissed for cause.  The

9   court acknowledges that "the willingness of a prosecutor to accept minority jurors weighs

10  against the findings of a prima facie case."  *United States v. Chinchilla*, 874 F.2d 695, 698 n.4

11  (9th Cir. 1989).  Yet, there remains the racially conscious inquiry by the prosecutor as to African

12  Americans in particular and the fact that the challenged juror, Juror No. 2, is African American.

13  In light of the above, the circumstances of the striking of Juror No. 2 raise an inference which, if

14  not rebutted, suggests that race was a motivating factor in the prosecutor's exclusion of this

15  juror.

16         Finally, the prosecutor's removal of Juror No. 2 did not occur in isolation.  Rather, the

17  fact that the prosecutor asked a race-based question and used the juror's response as an

18  explanation for the removal of that juror suggests a racially conscious strategy for conducting

19  voir dire that bears on the credence of the explanations that were articulated for the removal of

20  yet another African American juror.

21                          **ii.  Juror No. 3**

22         Petitioner also challenges the prosecutor's peremptory challenge to Juror No. 3.  For the

23  following reasons, the court recommends that this claim be granted.

24

25         [10]  The first African-American potential juror was excused by the court for cause because
    he was a relative of petitioner's.  RT at 159.  Another African-American juror was apparently
26  challenged by the defense.  *Id.* at 163.

1        Neither party challenges the trial court's conclusion that petitioner established a prima

2    facie case of racial discrimination and that the prosecutor satisfied his burden in step two of the

3    *Batson* analysis by providing a specific race-neutral explanation for his strike of Juror No. 3.

4    The sole issue, therefore, is whether the California courts unreasonably concluded that petitioner

5    failed to meet his ultimate burden of establishing that the prosecutor's challenge was motivated

6    by racial discrimination.  As described above, the prosecutor explained that he excused Juror No.

7    3 because his demeanor during the voir dire of other jurors reflected he might not be able to get

8    along with or tolerate the opinions of others.  ART at 192.  He wanted a jury that could "get

9    along" and not be "overly sensitive at every comment or expression stated by the other

10   prospective jurors."  *Id.*  The prosecutor also explained that he had excused Juror No. 1 for the

11   same reason: her physical reaction to some of the answers given by the other jurors on voir dire.

12   *Id.*  In other words, the prosecutor's reasons for excluding Jurors 3 and 1 were based entirely on

13   their demeanor.

14       Because a juror's demeanor cannot be gauged from a transcript, federal courts generally

15   defer to the state trial court's evaluation of whether the prosecutor genuinely relied on a juror's

16   demeanor in exercising a peremptory challenge.  *Snyder v. Louisiana*, 552 U.S. 472, 479 (2008).

17   However, deference is not warranted where the record does not show that the trial court actually

18   made a determination concerning the juror's demeanor.  *Id.*  Here, the trial court did not make

19   any findings concerning the demeanor of Juror No. 3 or the prosecutor's sincerity, but simply

20   found that the stated reasons were race-neutral on their face.  The trial judge did not say whether

21   he agreed with the prosecutor's observations of the demeanor of Jurors 3 and 1, or even whether

22   he observed the jurors' reactions and demeanor himself.[11]

23

24       [11] His specific ruling was the following:

25              All right.  The Court finds that there was a prima facie showing but
               the People have stated grounds sufficient to overcome the *Wheeler*
26             motion.

1        In its opinion, the California Court of Appeal simply deferred to the trial court,

2   concluding that the trial judge was in the best position to evaluate whether the prosecutor's

3   reasons for excluding Juror No. 3 were race neutral.  Opinion at 14.  The appellate court also

4   found that the trial court had made an "implied finding" that the prosecutor's reasons for

5   excusing Juror No. 3 were "sincere and genuine," and that this implied finding was entitled to

6   "great deference" on appeal.  *Id.*  However, because of the absence of any express findings by

7   the trial court concerning the demeanor of Juror No. 3, this court cannot presume that the trial

8   court credited the prosecutor's assertion that Juror No. 3's reaction to the voir dire of other jurors

9   implied that he would not be patient or tolerant during deliberations.  The trial judge's

10  conclusory statement that "the People have stated grounds sufficient to overcome the *Wheeler*

11  motion" does not show that the trial judge "actually made a determination concerning [the

12  prospective juror's] demeanor."  *Snyder*, 552 U.S. at 479.  Mere acknowledgment that the

13  prosecutor's proposed justifications were race-neutral does not amount to a factual finding that

14  the trial judge agrees with the prosecutor's assessment of the juror's demeanor.  *Id*. at 479 (court

15  could not "presume that the trial judge credited the prosecutor's assertion that [a prospective

16  juror] was nervous" when the judge simply stated, "I'm going to allow the challenge."); *Cook v.

17  LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010) (California Court of Appeal failed to undertake a

18  meaningful inquiry into evidence of prosecutor's intent in striking minority jurors where the

19  court "merely 'reiterated the prosecutor's stated reasons, and then found they were race-

20  neutral'") (citation omitted); *Reynoso v. Hall*, No. 08-15800, 2010 WL 3516410, *5 (9th Cir.

21  Sept. 7, 2010) (trial judge's statement "I accept those reasons as being not based upon race or

22

23          But I have to say, Mr. Ho, that you're getting very close, and this
            is the situation where that's something I would – I'm actually very

24          close to entertaining granting it.  But based upon your
            representations that you are observing the reactions of these

25          various jurors and their – and you're excluding other folks for like
            reactions that I deny the motion.

26  ART at 195.

32

ethnicity" did not constitute a factual finding regarding the juror's demeanor).[12]  Here, the state

courts did not satisfy the requirement of *Batson* that the court must, at step three of the analysis,

evaluate the entire record to determine the persuasiveness of the prosecutor's stated reasons for

striking Juror No. 3.[13]  Simply basing the denial of the *Batson* challenge on the prosecutor's

"representation that you are observing the reactions of these various jurors" does not constitute a

factual finding regarding the juror's demeanor but rather, as in *Cook*, merely reiterates the

prosecutor's statement.  593 F.3d at 815.

This court also notes that petitioner's trial counsel challenged the prosecutor's

characterization of the demeanor of Juror No. 3.  As set forth above, defense counsel stated that

while he had seen numerous jurors visibly react to the statements of Juror Nos. 4 and 5, he had

not seen Juror No. 3 react in that way.  He stated, "I didn't see any of the things that the

Prosecution saw whatsoever."  ART at 193.  He also argued that it was unfair to single out Juror

No. 3 for making facial expressions when many other jurors had done the same.  *Id.*  The trial

judge did not respond to defense counsel's statements nor did he describe his own observations,

if any.  Because there were conflicting observations by counsel in this case, this court may not

presume that the trial judge credited the prosecutor's assertion that Juror No. 3 had a negative

demeanor over defense counsel's assertion that he did not.  *See Reynoso*, 2010 WL 3516410, *5

(record did not support prosecutor's demeanor-based reason for striking Hispanic juror where,

among other things, defense counsel disputed the prosecutor's assessment of the juror's

demeanor and the record did not show the trial judge actually made a determination concerning

the juror's demeanor); *see also Stevens v. Epps*, 618 F.3d 489, 500 (5th Cir. 2010) (state court

---

[12]  Citation of this unpublished disposition by the Ninth Circuit Court of Appeals is appropriate pursuant to Fed. R. App. P. 32.1 and U.S. Ct. of App. 9th Cir. Rule 36-3(b).

[13]  As noted in *Cook*, "though *Batson* did not explicitly require a judge to describe his analysis on the record, the Court in *Miller-El*, 545 U.S. at 241, 125 S.Ct. 2317, "*presumed* the trial court and state appellate court did not undertake [such] analysis because [it] was not detailed in their opinions." 593 F.3d at 816 n.1 (quoting *Green v. LaMarque*, 532 F.3d 1028, 1030 n.2 (9th Cir. 2008)) (emphasis in original.)

did not unreasonably determine that trial judge implicitly credited the prosecutor's assertions
that he believed the juror had a negative demeanor, where defense counsel did not attempt to
rebut the prosecutor's assertions about the demeanor of the excused juror).

Further, the prosecutor did not ask Juror No. 3 any questions in order to inquire into or
explore his allegedly negative demeanor or facial expressions.  *See Miller-El*, 545 U.S. at 244
("[T]he state's failure to engage in any meaningful voir dire examination on a subject the State
alleges [causes it concern] is evidence suggesting that the explanation is a sham and a pretext for
discrimination."); *United States v. Collins*, 551 F.3d 914, 922 (9th Cir. 2009) (finding an
inference of discrimination based, in part, on the prosecutor's failure to ask a juror questions on
the topic that allegedly served as a basis for striking the juror); *Green*, 532 F.3d at 1033 (finding
the prosecutor's race-neutral reasons to be pretextual because, in part, "[t]he prosecutor's stated
reason that [the struck juror]'s five jobs illustrated she could not get along well with others was
undermined by the fact that he did not ask her a single question about why she changed jobs").
Furthermore, the trial judge failed to question any of the jurors before accepting the prosecutor's
reasons for excluding Juror No. 2.

In *Snyder*, which was decided before petitioner's conviction became final, the prosecutor
exercised peremptory challenges against all five of the prospective black jurors.  When defense
counsel made a *Batson* objection concerning one of those jurors, the prosecutor explained that he
exercised a challenge against the juror for two reasons: (1) the juror appeared to be nervous
during voir dire; and (2) the juror expressed a concern that he would miss college classes if he
served on the jury and the prosecutor was worried the juror might rush to judgment in order to
get back to school.  552 U.S. at 478.  Although the defense disputed both of these explanations,
the trial court summarily overruled the *Batson* challenge.  *Id.*  The United States Supreme Court
reversed the denial of Snyder's appeal, concluding that the prosecutor's stated reasons for
excluding the juror were a pretext for racial discrimination.

////

1    The Supreme Court noted that race-neutral reasons for peremptory challenges "often

2    invoke a juror's demeanor" and that "determinations of credibility and demeanor lie peculiarly

3    within a trial judge's province." *Id.* at 477.  The court explained, "[i]n this situation, the trial

4    court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent,

5    but also whether the juror's demeanor can credibly be said to have exhibited the basis for the

6    strike attributed to the juror by the prosecutor." *Id.*  The Supreme Court described the trial

7    court's role in evaluating *Batson* claims as "pivotal" because of that court's ability to evaluate

8    the demeanor of both the prosecutor and the excluded juror(s). *Id.*

9    Considering the nervousness justification first, the Supreme Court concluded that it was

10   unable to defer to the trial court's conclusion that no discrimination had occurred because there

11   was no evidence the trial judge based his *Batson* ruling on the juror's demeanor. *Id.* at 478.  In

12   other words, because the trial court had not made an express determination regarding the

13   prosecutor's first reason – the juror's demeanor – the court refused to presume that the trial court

14   relied on that reason in denying the *Batson* challenge. *Id.*  The court noted that the trial judge

15   did not describe his own observation of the juror's demeanor and may not have agreed with the

16   prosecutor that the juror seemed nervous.  Accordingly, the Supreme Court rejected the

17   prosecutor's first rationale because it did not find any evidence in the record to support his

18   contention that the juror appeared nervous. *Id.* at 479.

19   The Supreme Court then considered the prosecutor's second rationale and rejected it after

20   an analysis of the specific facts of that case. *Id.* at 479-85.  Because the court found no support

21   in the record for either of the prosecutor's stated reasons for eliminating the juror in question,

22   and because "the record does not show that the prosecution would have presumptively

23   challenged [the juror] based on his nervousness alone," it concluded that the prosecutor's proffer

24   was pretextual and that he had exercised the challenge with discriminatory intent. *Id.* at 485-86.

25   ////

26   ////

35

1   Put another way, the Supreme Court concluded that the adverse inference created by the use of

2   the second, pretextual reason was not overcome by the first reason, which found no support in

3   the record.

4       In *Thaler v. Haynes*, ___ U.S. ___, 130 S.Ct. 1171, 1172 (2010), the United States

5   Supreme Court clarified that neither *Snyder*, nor any other United States Supreme Court case,

6   "clearly establishes that a judge, in ruling on an objection to a peremptory challenge, must reject

7   a demeanor-based explanation unless the judge personally observed and recalls the aspect of the

8   prospective juror's demeanor on which the explanation is based."  Rather, a judge ruling on an

9   objection to a peremptory challenge must "tak[e] into account all possible explanatory factors in

10  the particular case."  *Id.* at 1174 (quoting *Batson*, 476 U.S. at 95.)

11          Thus, where the explanation for a peremptory challenge is based
            on a prospective juror's demeanor, the judge should take into
12          account, among other things, any observations of the juror that the
            judge was able to make during the *voir dire*.  But *Batson* plainly
13          did not go further and hold that a demeanor-based explanation
            must be rejected if the judge did not observe or cannot recall the
14          juror's demeanor.  Nor did we establish such a rule in *Snyder*.

15  *Id.*  The court noted that, in *Snyder*, the trial judge overruled the *Batson* objection without

16  explanation and, therefore, "the peremptory challenge could not be sustained on the demeanor-

17  based ground, which might not have figured in the trial judge's unexplained ruling."  *Id.* at 1174-

18  75.

19      As in *Snyder*, the reasons offered by the prosecutor in this case for striking Juror No. 3 do

20  not withstand scrutiny.  The trial court did not specifically credit the prosecutor's observations

21  about this juror's demeanor or the demeanor of Juror No. 1, who was allegedly excused for the

22  same reason.  The prosecutor's demeanor when explaining his strike was not described by the

23  trial judge and is therefore not apparent from the record.  Petitioner's counsel disputed the

24  prosecutor's observations about the demeanor of Juror No. 3.  This court also notes that in

25  *Snyder*, the court declined to credit the prosecutor's claim that the struck juror had a nervous

26  demeanor, in part because the peremptory challenge was not exercised until some time after the

juror was questioned.  The court reasoned that, under these circumstances, the trial judge might

not have recalled the juror's demeanor at the time the *Batson* challenge was raised.  *See Snyder*,

552 U.S. at 479; *Thaler*, 130 S.Ct. at 1175.  The same is true here.  Essentially, the trial and

appellate courts rejected petitioner's *Batson* challenge based on the prosecutor's assertions about

the facial expressions of Juror No. 3, which were contradicted by the defense attorney,

apparently not noticed or remembered by the trial judge, and not clarified with questions to the

juror himself.  According to the cases cited above, this is insufficient.

Other evidence in the record implies the presence of racial discrimination.  There were

three prospective African-American jurors in the jury box after the defense excused one African-

American juror and another one was excused for cause.  Two of these jurors were challenged by

the prosecutor.  The third African-American juror, Juror No. 6, was later excused for cause

because of his strong ties to law enforcement.[14]  Therefore, it appears that no African American

jurors served on petitioner's jury.  This evidence supports a finding of racial discrimination in

the striking of Juror No. 3.  *See Green*, 532 F.3d at 1033 ("Additional evidence of racial

discrimination includes the fact that the prosecutor used peremptory challenges to eliminate all

six African-Americans from the seated jury pool."); *Williams*, 432 F.3d at 1107 (petitioner

established an inference of racial discrimination under *Batson* based on statistical analysis alone,

where the prosecutor used three of his first four peremptory challenges to remove blacks from

the jury panel, and only four of the first forty-nine potential jurors were black); *Fernandez v.*

[14]  The prosecutor explained that he intended to pass with Juror No. 6 on the panel "in light of the questions that he's answered and his demeanor."  ART at 192-93.  There is no evidence in the record of the demeanor of Juror No. 6, and the prosecutor's unexplained statement provides no guidance on that subject.  The fact that the prosecutor accepted the jury with one African-American still seated is not dispositive of whether he acted with racial animus in striking Juror No. 3.  *Williams v. Runnels*, 432 F.3d 1102, 1109 (9th Cir. 2006 (accepting a jury which contains minority jurors does not, by itself, refute the inference that challenges were facially motivated where they occurred late in the selection process); *Reynoso*, 2010 WL 3516410, at *5 (quoting *People v. Snow*, 44 Cal.3d 216, 225 ("Nor does the fact that the prosecutor 'passed' or accepted a jury containing two Black persons end our inquiry, for to so hold would provide an easy means of justifying a pattern of unlawful discrimination which stops only slightly short of total exclusion.")).

1   *Roe*, 286 F.3d 1073, 1077-1080 (9th Cir. 2002) (inferring racial bias where four out of seven

2   Hispanics and two blacks were challenged by the prosecutor); *Turner v. Marshall*, 63 F.3d 807,

3   812 (9th Cir.1995) (holding that a prima facie showing of discrimination had been

4   made where the prosecutor challenged five of nine black jurors), *overruled on other grounds* by

5   *Tolbert v. Page*, 182 F.3d 677, 681 (9th Cir. 1999) (en banc).

6       It is true that a prosecutor's reasons for striking a juror may be "founded on nothing more

7   than a trial lawyer's instincts about a prospective juror . . . so long as they are the actual reasons

8   for the prosecutor's actions." *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (quoting

9   *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)). "Excluding jurors because of

10  their profession, or because they acquitted in a prior case, or because of a poor attitude in answer

11  to voir dire questions is wholly within the prosecutor's prerogative." *United States v. Thompson*,

12  827 F.2d 1254, 1260 (9th Cir. 1987). However, there is no evidence in the record that the

13  prosecutor's demeanor-based reason for striking Juror No. 3 was the actual reason for the strike

14  and, as described above, other evidence in the record implies that it was not. "Courts should not

15  allow nebulous expressions of discomfort to justify striking a juror." *Coombs v. Diguglielmo*,

16  616 F.3d 255, 264 (3rd Cir. 2010).

17      A federal habeas court can grant habeas relief only "if it was unreasonable to credit the

18  prosecutor's race-neutral explanations for the Batson challenge." *Rice v. Collins*, 546 U.S. 333,

19  338-39 (2006). Under the circumstances of this case, this court concludes that it was

20  unreasonable for the state courts to credit the prosecutor's explanation for his challenge of Juror

21  No. 3. Taken as a whole, the record compels a finding that the prosecutor's "actual and only

22  reason for striking [Juror No. 3] was [his] race." *Kesser*, 465 F.3d at 360. The state-court

23  decision rejecting petitioner's *Batson* challenge to Juror No. 3 is contrary to clearly established

24  federal law and was based on an unreasonable determination of the facts in light of the evidence

25  presented in the state court. Accordingly, petitioner is entitled to habeas relief on his *Batson*

26  claims with respect to Juror No. 3.

**III. Conclusion**

    For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be granted on petitioner's *Batson* claim with respect to jurors No. 2 and 3 and denied as to all other claims.  Subject to the following exception, the state should be directed to commence proceedings in the state court leading to retrial within 60 days of any order adopting these findings and recommendations.  If either party appeals the judgment, that directive should be stayed until 60 days after the issuance of the mandate following a final appellate decision or the denial of a petition for writ of certiorari, whichever occurs later.

    These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:   June 6, 2012.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE